## TURLEY *v.* TAYLOR.

1. CONSTITUTIONAL LAW. *Judgment in another State. When conclusive.*
   Under sec. 7, art. 4 of the Federal Constitution and accordant Federal legislation, it is settled that a valid judgment rendered by a court in one of the United States having jurisdiction of the person and subject matter is conclusive in every other State.

   Cases cited: Stegall *v.* Wyche, 5 Yerg., 83; Estes *v.* Kyle, Meigs' R., 34.

2. SAME. *Same. Not conclusive. When.* This principle is not applicable, however, to instances where the judgment is against a citizen of another State, without service of process under the laws of the State in which it is rendered, dispensing with personal service. In such cases the judgment is not conclusive.

   Case cited: Brown *v.* Brown & McCullough, 2 Sneed, 435.

Turley *v.* Taylor.

3. SAME. *Same. Same.* The rule is subject to the further qualification that if the judgment was procured by the fraud of the party obtaining it, it may be impeached in this State for the same reasons that would justify a court of equity in enjoining a judgment at law here.

Case cited: Coffer *v.* Neely, 2 Heis., 304.

4. CHANCERY PLEADING AND PRACTICE. *Jurisdiction to enjoin judgment at law. Surprise.* Equity will enjoin a judgment in this State in cases where the defendant in the judgment was ignorant of the fact in question pending the suit, or was prevented from making his defense by surprise, in the legal acceptation of that term, occasioned by the misconduct of the opposite party, unmixed with negligence on his part.

5. CONTRACT. *Construction of. Promissory note.* A note payable on its face, when due in current bankable funds, is dischargable in such funds as are current and bankable at the time of its maturity, although the consideration originally given for it was Confederate treasury notes.

The case of Thorington *v.* Smith cited, and held not to apply.

---

FROM CARTER.

---

Appeal from the Chancery Court. H. C. SMITH, Chancellor.

J. MACKENBIEN and J. THOMAS JONES for complainant.

THOS. DONALDSON for defendant.

FREEMAN, J., delivered the opinion of the court.

The original bill is filed to enforce a deed of trust given to secure a note for $9,000, of date February, 1863, said note being in the words following: Two years after date, with interest from date, I promise to pay Wm. H. Turley $9,000 in current bankable

funds, and I am to have the privilege at any time of paying after six months from this date.

N. G. Taylor, having become a resident of the State of Maryland for a time, and while so residing in that State, Turley brought suit on the note in the Circuit Court of Howard county, on the 1st of March, 1869, the defendant, as appears from the transcript of the record in that case, being required to appear and answer at the March Term, 1869. The declaration was filed 29th day of March, and on the 21st of June thereafter the defendant filed a plea alleging the pendency of an equity proceeding in Tennessee to enforce the same debt, which plea was demurred to and demurrer sustained by the court August 1, 1869, whereupon he filed his pleas, amounting to the general issue, on the 13th of September, 1869, and thereupon trial was had before the court (without the intervention of a jury, by consent), when, after taking time to consider the case (until the 1st day of November), a judgment in favor of plaintiff for the full amount of the note, with interest, was rendered. To this action of the court defendant excepted, and had his bill of exceptions signed, and the case was taken to the Court of Appeals for the State of Maryland, in which court, on the first Monday in October, 1870, a judgment was rendered, affirming the judgment of the court below.

In July, 1871, this bill was filed, alleging in substance the above facts, and that said judgment remained in full force and effect, asking the sale of the property in the deed of trust for the satisfaction of his

debt thus reduced to judgment, and an enforcement of the trust by the court.

To this bill defendant filed an answer, which he makes a cross-bill, in which he seeks to be relieved from the effect of the judgment rendered in Maryland, and have the rights of the parties on the original liability re-investigated and re-adjudicated. With this cross-bill he files as an exhibit a transcript of the proceedings in the Maryland suit, containing, among other things, the bill of exceptions, or finding of the judge who tried the case in the Circuit Court, which was transmitted to the Court of Appeals for the assignment of errors, and on which the judgment of that court was pronounced.

The grounds on which the relief sought in the cross-bill are based, as taken from its allegations, are as follows: That the defendant took an appeal from said judgment to have the same corrected, as he was surprised by the testimony of complainant to the effect that the Confederate money was at par value in Carter county at the time said note was executed, and that it was so paid and received by the citizens of said county at that time. He says that he did not anticipate such testimony, since it was, as he charges, absolutely untrue, and he was not, therefore, prepared to meet and contradict it, as he charges he could and would have done had he suspected such an erroneous, untrue, and, therefore, fraudulent effort would be made. Being thus surprised, and hoping, he says, that he might be permitted to show the facts on this question to be other than as above, and the further fact that

when said note fell due Confederate money was the currency of Carter county, which, he says, complainant had testified was not the case, he took the appeal to the Court of Appeals of the State of Maryland, which court, following the common law, and not the practice of the spiritual courts of England, refused to hear any additional testimony, and so affirmed the judgment. He then says that this respondent shows to this court, and charges that it was by means of these erroneous or false representations and testimony of complainant that said fraudulent judgment was obtained.

He then proceeds with the history of that case as follows, and says, that though he believed and was satisfied, from information received at the time, that the testimony of complainant that Carter county was in the Federal lines, and United States currency the only circulating medium and bankable funds at the date of the maturity of the note, was incorrect and fraudulent, yet he could not be positive in his contradiction of the same, nor could he, by any possible diligence, procure witnesses to the contrary after issue and before trial, and he, therefore, charges he was surprised by the testimony. He says that since this time, however, he has clearly ascertained the facts, and can now make the proof required; but from want of the positive knowledge of the facts at the time of the trial, and time to procure witnesses, he insists he was deprived of the benefit of the facts.

On these allegations of fact, together with the facts shown in the Maryland record, exhibited with this answer, to which he refers for a fuller view of the

Turley v. Taylor.

case, he bases his prayer for the impeachment of the judgment for fraud in obtaining it.

We have thus fully set forth the facts, as stated by the respondent, that we may see the precise grounds on which he relies for the relief sought, as set out in the pleadings in this case.

The case involves a large sum, and has been argued with unusual ability on the part of both parties, presenting the legal questions as well as the facts in their clearest and most forcible aspect.

We now proceed to ascertain what is the law arising on these facts. It is proper to say, that on the part of complainant in the original bill, in his answer to the cross-bill, all charges of fraud and falsehood are most emphatically denied, and the court is referred to the statement of his testimony presented in the Maryland record, which, though claimed not to fairly represent his testimony in some particulars, is pointed to as a vindictation from all charges of fraud or false statement.

By art. 4, sec. 7 of the Constitution of the United States, it is provided, that full faith and credit shall be given in each State to the public records and judicial proceedings of every other State, and Congress may, by general laws, prescribe the manner in which such acts, records, and proceedings shall be proved, and the effect thereof. By the act of Congress, in pursuance of the above clause of the Constitution, it is provided, after giving the forms as to authentication, etc., "and said record or judicial proceedings shall have the same faith and credit given them in

any court of the United States as they have by law or usage in the courts of the State whence the said records are or shall be taken." Under these provisions it is settled, that if the court rendering the judgment had jurisdiction of the person and subject matter, and the judgment was valid in such State, then it is valid in this State. See 5 Yer., 83; *Estes* v. *Kyle*, Meigs' R., 34; 2 Am. L. Cases, last Ed., 617–18, and authorities.

The apparent exception to this principle is, that if no service of process was had, and judgment taken against a citizen of another State, in pursuance of a regulation or law of the State, it would not have this conclusive effect, as the State could not bind by the laws citizens of other States. See *Brown* v. *Brown & McCulloch*, 2 Sneed, 435. But while all this may be true, it is, we think, a sound principle, as held by this court in *Coffer* v. *Neely*, 2 Heis., 304.

Such judgments may be impeached for fraud on the part of the party obtaining them, but this must be done on the same grounds as would be required to enjoin a judgment of one of our own Courts.

What, then, is the principle on which a Court of Chancery will enjoin a judgment rendered at law in this State, where the court had jurisdiction of the person and subject matter of the controversy? We take it to be clear that a party cannot impeach such a judgment unless he can show it was obtained by the fraud of the other party, for it is the obtaining of the judgment that is complained of, and not the question of an independent defense that might be made to

Turley *v.* Taylor.

the original cause of action had no such judgment been rendered as the judgment in this case, as we have seen is conclusive, unless it can be set aside on the grounds alleged, as having been obtained by the fraud of the plaintiff, or by surprise in the legal sense of that term. The general rule as to interference by a Court of Chancery is thus laid down by Chancellor Kent in *Foster* v. *Wood,* 6 Johns. Ch. R., 89. The rule is, that a Court of Chancery will not relieve against a judgment at law, on the ground that it is contrary to equity, unless the defendant in the judgment was ignorant of the fact in question pending the suit, or it could not have been received as a defense, or unless he was prevented from availing himself of the defense by fraud or accident, or the act of the opposite party, unmixed with negligence on his part.

Let us examine for a moment the facts of this case, and see if these elements are found in it. Take the statements of the defendant's cross-bill, and they amount to this, that being sued in a court of law, and a judgment sought on the note in question, he employed counsel, who made up the pleadings and issues, raising, as we see, all the matters of defense now insisted on before us; that he went to trial on these issues in a court where plaintiff was a competent witness, and likewise the defendant; that on the trial, on a question material to the issue, the plaintiff, as a witness, proved or testified to a state of facts which the defendant did not think true, and that defendant then took the stand, and testified to a different state

of facts, but, perhaps, with less emphasis, and the court trying the case, in its judgment adopted the statement of the plaintiff as the true state of the case, and came to a conclusion adverse to the defendant. Now, can there be any element of fraud in this on the part of the plaintiff? Was not the fact that a suit had been brought on the note notice to the defendant that plaintiff would support his case, or seek to do so, by such proof as would enable him to recover? We think this too clear for argument. If the testimony given was competent, as supporting the claim asserted in his pleadings, then the defendant had of necessity full notice that such proof might be expected to be adduced. If it was not competent, his remedy was plain, to object to its introduction, and we are bound to presume it would have been excluded by the court, or if not, the error would have been corrected by the revising court to which the case was ultimately taken. But we find that no objection was taken to the competency, on the contrary, the defendant undertakes to meet it by counter proof, and fails, and now asks that the judgment be held void for fraud, because the testimony had been given. No fraud in such a case can be predicated on the fact of making the precise proof, which, as a matter of law, the defendant was notified by the suit that he would be fairly called on to meet.

But it is claimed that the defendant had not time to procure witnesses after issue joined on the questions stated. But that this objection is not well taken, nor can it aid the party, is shown by the fact that there

Turley *v.* Taylor.

is no objection shown to going into the trial at the time, no continuance asked for, nor delay sought; on the contrary, we think it fairly inferable, from the record, that he willingly went into the trial, relying on the fact. that he was present and a competent witness, and was also prepared with another witness, one Howard, who had resided in Richmond, Virginia, perhaps, during the war, to prove the material facts relied on as to the value of Confederate money.

In addition to all this, respondent says he was satisfied from information he had, that the alleged facts deposed to by Turley were not correct. Yet that he could not be positive in his contradiction of them at the time. If, in fact, with this information he was surprised, it was certainly his own fault to go into the trial without an effort, at least to have the facts before the court, and, then, after the trial, if surprised by the proof, he should have moved for a new trial, presenting the fact of such surprise in proper form to the court; and we apprehend that no court administering the common law, would have hesitated upon a proper case to have granted such an application. Instead of this he alleges that he took an appeal, but found to his disappointment apparently, that no new evidence was permitted on such appeal. Ignorance or mistake of law, however, can in no case excuse a party in a case like this, nor tend to show either fraud or surprise in the testimony which had already been heard.

Without further elaborating this branch of the question, a simple illustration will put the question of
25—VOL. 6.

fraud at rest. Suppose Turley, instead of being a witness himself, had tendered on the trial another party who had sworn to the facts deposed, and thus have sustained his case, it could not be pretended that there would have been any fraud in thus making out his case; yet there can be no difference in principle between that case and the present. It would only be the proof of a cause of action by a competent witness in either case, and would have furnished no ground of complaint from the other party, unless it should be required, that a plaintiff ought to state in advance to his opponent the facts which he expects to adduce in proof of his cause of action.

Fraud is thus defined by Mr. Kerr in his work on the subject, p. 42: "All surprise, trick, cunning, dissembling and other unfair way that is used to cheat any one." But he adds further: "Fraud in all cases implies a willful act on the part of any one whereby another is sought to be deprived, by illegal or inequitable means, of what he is entitled to, either at law or equity."

Admitting all that is charged in the cross-bill, there appears no device or cunning on the part of Turley in this case by which the judgment was obtained. No act is shown on his part to have been done by which Taylor was in any way hindered or misled in the preparation of his defense of his case in the Maryland court. In nothing does it appear was he misled to his prejudice, nor was there the slightest confidence reposed which was violated. It was but a suit fairly and openly brought, the purpose shown to obtain a

Turley *v.* Taylor.

judgment, and, as a matter of course, to adduce such proof as would be competent for such purpose.

The failure to meet this proof may have been the misfortune of Taylor, but cannot, in fairness, be imputed to any wrongful act of the plaintiff. This view of the case might be conclusive of it, but it is proper to look at the evidence as presented to see if the facts as alleged, or the inference drawn in the answer, are legitimate, and whether the facts furnish ground for the charges made. The charge is, that he was surprised by the testimony of Turley, to the effect that Confederate money was of par value in Carter county at the time of the loan, February 9, 1863, and that it was so paid and received by the citizens of that county at the time. This is the main matter charged. We turn to the bill of exceptions taken in the case, which, however, is a very imperfect evidence of what was deposed to, as it only purports to contain the conclusion of the judge, as to what was proven, and not the precise language of the witness.

From this we find the statement of Turley was, or purports to be, that at the date of said loan and note, Carter county was in the Confederate lines, and subject to Confederate authorities, and that he had known about that time of transactions of sales of property for Confederate money, in which said money was rated at its par value. This he speaks of as of his own knowledge. We have examined this record carefully, and fail to find a single attempt even to disprove the truth of this statement. We take it that, the language unquestionably means that the notes were

taken in exchange for property at their face value, without discount or allowance for depreciation; but until this fact is contradicted, and shown to have been false, we must presume in favor of its truth, and especially as the defendant had the right to cross-examine the witness and show who were the parties making such sales, but failed to make any attack in this way on the statement when made or since. This can furnish no ground for relief here. In fact, the question was one entirely immaterial in the case as a matter of law, whether true or false, for by the contract the debt was payable "in current bankable funds, two years after date," that is, February, 1865, so that the value of the money when loaned was not the question, but what was current bankable funds when it fell due. This is not like the case of *Thorington* v. *Smith*, where the payment was to be in dollars, and from the surrounding circumstances, the court, in construing the contract, hold that "dollars" meant dollars in Confederate money. If the note being for loaned money in Confederate treasury notes had been for simple dollars, then, under the rule laid down by this court in several cases, we would presume it was to be paid in like currency as a matter of construction of the meaning of the contract; but as we have held, it would be competent to show that such was not the purpose of the parties to the contract at the time, and that they had a different understanding, to which they both assented, and then the real contract would be carried out by the court. The face of this note shows an express contract for payment in "current bankable

Turley *v.* Taylor.

funds," and no court could deny their right to make such a contract.

The other matter stated is, that he was surprised that by the fraud of plaintiff it was made to appear on the trial of the cause that "greenbacks" was the currency of Carter county at the time the note fell due.

On referring to the statement of the bill of exceptions again, on this question, we find that plaintiff and defendant both left East Tennessee soon after the making of the note, and did not return until after the close of the war, both going into the Federal lines, meeting occasionally in New York, and talking over the matter of this debt, as well, perhaps, as in other places. We find the judge states in the bill of exceptions, as proven by plaintiff, that after he left Carter county, and before the note fell due, said county was occupied and held under the control of Federal forces, and was so when it fell due, but he adds: The knowledge of this fact he derived from the history of the country and from communications which he held with persons residing in that section, and not at all from any personal knowledge of his own.

It is seen from this that the party only gives his opinion and belief, and gives the grounds of it, which certainly we may assume were as open to the knowledge of Taylor as to himself. The history of the country, we must presume, was as unknown to Mr. Taylor as to Turley. As to whether persons had or not given this information to Mr. Turley, he was open to cross-examination, yet there appears no effort to break the force of it in this way; nor does there

appear in this record any thing to show that he had not been so informed. It seems, as a matter of fact, that the country was not held by Federal forces, but it is not shown that Turley did not so believe, nor had not been so informed at the time he deposed. Taylor, however, introduces himself, and the record says, proved that at the date of the note Confederate money was worth from one-tenth to one-fifteenth of the value of gold, and that he knew of transactions then at that rate, and that after he and plaintiff left Tennessee, the county of Carter was sometimes in the occupation of the Confederate authorities, and then Confederate money was the currency; and sometimes of the forces of the United States, when greenbacks alone would be received, and that he believed at the time the note fell due, said county was in the possession of the Confederates, but on this point he could only speak from the history of the county, and not from his personal knowledge.

From this we see no ground on which the complainant can claim relief on the principle of surprise. He may possibly have been surprised, in the common acceptation of the term, but certainly was not in any legal sense of that term. Surprise, in the legal sense of the term, that would defeat a judgment, always involves the idea that there has been active misconduct on the part of the plaintiff amounting to much the same thing as fraud. In private transactions it is defined by Mr. Story's Eq. Jur., vol. 1, sec. 251, to be "an undue advantage taken of a party under circumstances which mislead, confuse, or disturb the just

results of his judgment, and thus expose him to be the victim of the artful, the importunate, and the cunning."

We need not again refer to the facts to show that Mr. Taylor, a man of high character and intelligence, aided by counsel such as he would naturally select and be able to command, was not in the condition to be the victim of such surprise in this case.  The above author adds, however, that it is not every suprise that will be sufficient, even to set aside a deed, and we may add, much more is this so as to solemn judgments of courts where the parties stand at arm's length, distinctly antagonized to each other, aided by learned counsel.  He says:  " The surprise here intended must be accompanied with fraud and circumvention, or at least by such circumstances as demonstrate that the party had no opportunity to use suitable deliberation, or that there was some influence or management to mislead him."  Without further reference to the facts, we need but say that it is clear none of these elements are found in this case.  The case of *W. G. Crank, adm'r,* v. *Flowers,* 4 Heis., 629, furnishes a clear illustration of such fraud and surprise as is above defined.

One other principle is invoked for relief in this case, that is, the maxim that he who seeks equity must do equity.  It need but be replied that this maxim has no application whatever to a case like the present.  As far as we are aware, in no case does it require of a party that he shall yield his clear legal rights, but is appropriate in cases such as where a

party who seeks to be relieved of usury, either in a note or judgment, by aid of a court of equity, when the court requires before it will aid him, that he shall pay what is actually due, with legal interest.

We need only add that while there may be much of apparent, and something of real hardship in this case to respondent, yet, when we take into consideration that he paid perhaps $3,600 of his own debts with this money, and the balance was expended in carrying on the manufacture of iron and payment of his employees, we cannot see that he has been greatly injured, or at any rate, not so as to shock the conscience at the result. Be this as it may, however, we can only look to the legal rights of practice, and cannot bend the rules of law to meet any real or supposed hard cases. We have found that hard cases, when yielded to, make most troublesome precedents which it is dangerous to make, and work great injury if followed.

The result is, the decree must be reversed, the amount due on the judgment be ascertained by calculation, or reference if desired, and the lands conveyed in the deed of trust be sold for payment of the debt by the clerk of this court, respondent paying costs of this and court below.